705 So.2d 990 (1998)
STATE DEPARTMENT OF REVENUE, CHILD SUPPORT ENFORCEMENT, on Behalf of Noemi VASQUEZ, Appellant,
v.
Sebastian J. AGUIRRE, Appellee.
Nos. 96-1244, 95-3543.
District Court of Appeal of Florida, Third District.
February 4, 1998.
*991 Robert A. Butterworth, Attorney General, Angelica D. Zayas, Barbara A. Ard and Jon Johnson, Assistant Attorneys General, for appellant.
Alan Michael Foody and Lance R. Stelzer, for appellee.
Before COPE, GODERICH and SHEVIN, JJ.
COPE, Judge.
The State appeals entry of judgment in favor of appellee, the putative father in this paternity action. We reverse.

I. PROCEDURAL HISTORY
Noemi Vasquez, on behalf of whom this appeal is brought, is the mother of a minor child born in 1987. In 1990, she filed an action to determine the paternity of appellee Sebastian Aguirre. In pursuit of that claim, Vasquez requested genetic testing on Aguirre, and in December 1990, the parties were ordered to undergo HLA testing. See § 742.12, Fla. Stat. (1989). Blood was drawn and submitted to Roche Biomedical Laboratories.
The results of the first test proved to be inconclusive. Roche then contacted Vasquez's counsel to advise her that additional samples were needed for a conclusive result. Although opposed by Aguirre, additional *992 blood was drawn for further testing and in January 1993 Roche filed its final report indicating a probability of paternity of 99.84%.
Aguirre retained Dr. Karl Muench of the University of Miami School of Medicine, a genetics expert, to evaluate the Roche data. Muench concluded that there was a probability of paternity of 99.03% and rendered a written opinion that Aguirre was the father. Aguirre discharged Muench and Vasquez retained him to serve as her expert.
Aguirre then retained Dr. Moses Schanfield of Analytical Genetic Testing Center, Inc. Schanfield criticized Roche's work and opined that the Roche results did not allow an opinion to be rendered on paternity one way or the other. Schanfield acknowledged that if his criticisms of the Roche work were correct, one way to resolve the matter would be to take another blood sample and conduct further testing. Aguirre opposed further testing and never procured any opinion excluding him from paternity.
After the first and second rounds of testing, Aguirre propounded extensive discovery requests. The requests generally covered all materials generated and used in connection with the testing. The purpose of the discovery requests was to permit Aguirre to confirm that Roche had followed all proper techniques and procedures in testing and evaluating the results.
Aguirre was dissatisfied with the response to his 1993 discovery requests. He filed a further discovery request and moved to compel discovery. The parties entered into an agreed order under which Vasquez was required to provide all the documents requested or have the results of the blood tests barred from admission at trial. After Vasquez provided Roche's response, Aguirre advised the court that the production was not sufficient, attached the affidavit of his expert outlining the omissions, and moved for the exclusion of the blood test results. Vasquez responded by providing an affidavit from Roche explaining its production and why there were no omissions other than a single gel form which was inadvertently overlooked. The parties disagreed as to whether certain items had previously been provided or whether they were included in the request at all. Following hearing, the trial court granted the motion, excluded the test results, and denied Vasquez's motion for additional testing under section 742.12(4), Florida Statutes.
The case proceeded to trial without any blood test results. Out of the hearing of the jury, Vasquez proffered the testimony of her expert from Roche as well as that of Dr. Muench that the scientific tests showed Aguirre to be the father of the minor child. Aguirre made a counterproffer of his expert's criticism of Roche's work and opinion that the scientific results were inconclusive.
During deliberations, the jury sent a note to the judge asking why there had been no blood test in this case, but was instructed to decide the case on the evidence received. The judge refused Vasquez's request for an instruction that no inference should be drawn for or against either party based on the absence of blood testing. The jury's verdict was in favor of Aguirre.
The State, on behalf of Vasquez, has appealed, arguing that the trial court erred both in excluding the blood test results and in failing to order additional testing. We agree on both points.

II. EXCLUSION OF EVIDENCE
It appears that the trial judge primarily based her determination to exclude the blood test results on the conclusion that Vasquez violated the parties' stipulation underlying the March 1995 agreed order. The trial court found that Vasquez and Roche had failed to produce 1) a single DNA preparatory gel form; 2) an item described by Aguirre as an "exclusionary log book"; and 3) all of Roche's policies and procedures manuals for the relevant time. We conclude that these items of nonproduction were minimal and inadvertent, and that there was no prejudice to Aguirre. The scientific evidence should not have been excluded.
We begin by emphasizing that this is a paternity proceeding brought for purposes of child support. Florida has a longstanding policy in favor of deciding cases on the merits, see Venero v. Balbuena, 652 So.2d 1271, 1272 (Fla. 3d DCA 1995), and that policy *993 occupies particularly great importance in paternity and other child-support-related cases. As one court has explained:
In accordance with Fla. R. Civ. P. 1.380(b)(2), upon a party's failure to obey a discovery order the court may impose sanctions including the striking of pleadings, prohibiting the introduction of evidence, and refusing to allow the presentation of a claim or defense. Although these are severe sanctions which should be employed only in extreme circumstances, their imposition is a matter within the discretion of the trial court. However, while the sanction imposed in the present case was intended to penalize appellant, it may also have had the effect of precluding a complete consideration of the needs of the minor child. As indicated in Locklear v. Sampson, 478 So.2d 1113 (Fla. 1st DCA 1985), the proceeding should not be viewed "as if it were no more than a simple claim between private parties to enforce a monetary obligation." It is the child, who was not a party to the discovery violation, for whom the support is intended. The court could have insured that the child's interests and rights were safeguarded by a thorough presentation of evidence, and imposed one of the various other sanctions authorized by Rule 1.380(b). But by imposing sanctions inhibiting a full consideration of the rights and interests of the minor child in the present case the trial court abused its discretion.
Mitchem v. Grubbs, 485 So.2d 891, 892 (Fla. 1st DCA 1986) (emphasis added; citation omitted); see Stiles v. Bargeron, 559 So.2d 365, 367 (Fla. 1st DCA 1990); see also State Department of Revenue v. Aravz, 678 So.2d 464, 465 (Fla. 3d DCA 1996).
With those principles in mind, we turn to the details of the discovery dispute. There is no record support for the conclusion that Vasquez failed to supply the "exclusionary log book." The record establishes that counsel for Vasquez had advised counsel for Aguirre that the lab did not have a document bearing that name well prior to the response to the request for production. Moreover, when Aguirre finally clarified what he was referring to by that description, not only was the item a secondary recordation of items already produced, but it became clear that counsel for Aguirre had the item all along. Vasquez should not have been penalized for not producing either a nonexistent item or an item of which Aguirre was already in possession. See A Aaable Bail Bonds, Inc. v. Able Bail Bond, Inc., 626 So.2d 1105, 1106 (Fla. 3d DCA 1993); Morales v. Four Star Poultry and Provision Co., Inc., 523 So.2d 1183, 1185 (Fla. 3d DCA 1988).
With regard to the other items, the failure to produce the single DNA gel form (which was in fact later produced) was mere inadvertence and did not in any way prejudice Aguirre. The same is true with regard to the policies and procedures manual. Roche produced to Aguirre all portions of the manual which related to the tests performed on the blood samples at issue here and did not produce the portions relating to other irrelevant tests. There was no prejudice to Aguirre by Roche's misunderstanding of the volume of its policies and procedures manuals desired by Aguirre.[1] In addition, Aguirre's expert stated in his deposition that he was in possession of the entire manual at all times. (T.3 at 388-89).
Here, Roche voluntarily[2] produced voluminous documents. Any nonproduction was inadvertent, minimal, and not prejudicial. That being so, no sanction should have been imposed at all, much less the sanction of excluding paternity test results. In the circumstances of this paternity action, the exclusion of the scientific evidence was unwarranted *994 and very harmful to the interests of the minor child. See Mitchem v. Grubbs, 485 So.2d at 892. As the Roche test results should not have been excluded, we reverse the judgment and remand for a new trial.

III. DENIAL OF MOTION FOR TESTING BY ANOTHER LABORATORY
As this case unfolded, it became clear that Aguirre planned to defend the case at trial by attacking the scientific techniques and internal procedures followed at Roche Laboratories.[3] Vasquez had obtained two expert opinions that Aguirre was the father of the child: one opinion by Roche itself and the other by Dr. Muench. Dr. Muench's opinion was predicated on the Roche test results, however, so that if those test results could successfully be attacked, then both of the scientific opinions of paternity would fall.
Vasquez proposed to meet Aguirre's attack on the validity of Roche's lab results by having a retest done by a second independent laboratory. Vasquez filed a motion under section 742.12(2), Florida Statutes (1995), for testing by a second laboratory. Aguirre opposed the motion and the trial court denied it. The court erred in doing so.
Section 742.12(4) regulates scientific testing to determine paternity. The applicable version of the statute provides, in part:
Subject to the limitations in subsection (2), if the test results or the expert analysis of the inherited characteristics is disputed, the court, upon reasonable request of a party, shall order that an additional test be made by the same laboratory or an independent laboratory at the expense of the party requesting additional testing.
§ 742.12(4), Fla. Stat. (1995).[4]
In denying Vasquez's motion for additional testing, the trial court took the view that since the statute directs the court to order "an additional test," id., this meant that only one additional test could be ordered. In this case, Roche itself found its first test results to be inconclusive, and requested that additional blood be submitted for further testing. The court granted the request for the additional blood draw. Since "an additional test" had been performed, id., the court concluded that it was without authority to order a second "additional test."
The trial court erred in its ruling. It is incorrect to read the statute as imposing a categorical maximum of one additional blood test. Section 742.12(4) authorizes additional testing where there is a showing of good cause under the criteria set forth in the statute. If, based on the circumstances of the case, there is good cause to order more than one additional test, the trial court has the power to do so.[5]
Here, Vasquez made the necessary showing of good cause to justify a second paternity test by an independent laboratory. Aguirre's expert, Dr. Schanfield, disputed Roche's test results and expert analysis. Aguirre had also submitted a witness list containing a number of other experts to challenge Roche's work. Under these circumstances, *995 it was reasonable and appropriate for Vasquez to a retest by a second independent laboratory. Even Aguirre's own expert, Dr. Schanfield, testified that one way to resolve Schanfield's objections to Roche's work would be to order additional testing.
As the trial court had the authority under the statute to order the additional testing and as good cause was shown, the trial court erred by denying the request for additional testing. We reverse the trial court's order on this point as well, and remand with directions to grant the motion for paternity testing by a second independent laboratory. This shall include DNA typing if requested by Vasquez or deemed appropriate by the testing laboratory. See generally Andre A. Moenssens et al., Scientific Evidence in Civil and Criminal Cases § 15.14 (4th ed.1995). The point is to reach an authoritative determination of paternity in this case, on the merits.

IV. SCOPE OF SCIENTIFIC TESTING
Aguirre claims that Roche violated the trial court's testing orders. The trial court's original order for scientific testing directed the parties to "submit to a Human Leukocyte Antigen test (HLA) at Roche Laboratories." The order for a redraw also specified that it was for "an additional HLA test." Aguirre contends that other scientific tests were performed besides HLA tests, and that such testing violated the court orders. We disagree.
Section 742.12, Florida Statutes (1995), authorized the court to "require the child, mother, and alleged fathers to submit to Human Leukocyte Antigen tests or other scientific tests that are generally acceptable within the scientific community to show a probability of paternity. The court shall direct that the tests be conducted by a qualified technical laboratory." § 742.12(1), Fla. Stat. (1995).[6] "A statistical probability of paternity of 95 percent or more creates a rebuttable presumption ... that the alleged father is the biological father of the child.... If the test results show the alleged father cannot be the biological father, the case shall be dismissed with prejudice." Id. § 742.12(3).
A trial court order for HLA testing should not be read narrowly, but instead should be read in light of its intended purpose. Trial judges are not typically scientists and in the field of paternity testing do not undertake to tell scientific laboratories how to perform their work.
When a trial court orders HLA testing under the statute, the court is requesting the laboratory's expert opinion on paternity. Such an order authorizes the laboratory to perform not only HLA testing, but also such additional scientific testing as may be needed in order for the laboratory to render an opinion on paternity.
Roche's proffered testimony explained the reasons for additional testing:
[Q] What is the primary purpose of paternity testing?
[A] There is a two-fold purpose1) to provide the wrongfully accused man a very high measure of protection against wrongful adjudication of paternity and, 2) if not excluded, to provide a measure of the significance of that fact. In other words, does he qualify because he is really the father or is it merely a coincidence?
[Q] Does your laboratory use a battery of tests in paternity cases?
[A] Yes.
[Q] Why are multiple tests included in the testing process?
[A] No single test i.e. HLA, consistently provides the wrongfully accused man an adequate measure of protection, nor does any single test, i.e. HLA, meet the minimal requirements for testing established by the AABB [American Association of Blood Banks].
[Q] If an alleged father is not excluded from paternity, what is the next step?

*996 [A] At that point, the lab would calculate the probability of paternity and combined paternity index for the case.[7]
The Roche representative went on to explain that after the first round of testing, the probability that Aguirre was the father "was in excess of 95%. It would have been sufficient to report per Florida statute, but fell below the laboratory in-house standard for private cases of 99%." The additional testing, in other words, was undertaken for Aguirre's protection. After further testing, Roche concluded that the probability of paternity was 99.84%.

V. COMMUNICATION BETWEEN ROCHE AND REQUESTING PARTY
Aguirre contends that it was improper for Roche to call Vasquez's attorney and tell her that the test results were inconclusive without including Aguirre's attorney in the conversation. We see no impropriety based on the facts of this case, but Aguirre is free to request the trial court to establish a communication procedure on remand, if desired.
In this case Vasquez requested paternity testing and Aguirre opposed it. The trial court orders directed that Roche perform the testing, but did not specify how communications with Roche would be handled. As moving party, Vasquez bore the responsibility in the first instance of advising Roche of the order and taking whatever steps were necessary to implement it.
After the first round of testing, Roche found the results inconclusive and needed a second blood draw in order to perform additional testing. Roche contacted Vasquez's attorney to advise her of this. Roche also explained that if the retest of Aguirre excluded him from paternity, a relative of Aguirre was the next most likely candidate as a possible father. Roche followed up with a written request for the redraw, which Vasquez's counsel forwarded to Aguirre's counsel and supplied to the court along with an appropriate motion.
As a practical matter, the testing laboratory must have a contact person to communicate with. Logically, that person will be the proponent of the testing, unless the trial court orders otherwise. If on remand Aguirre wants to establish a communication procedure for the period prior to the final report, then he may make that request to the court.[8]

VI. CONCLUSION
The judgment is reversed and the cause remanded for further paternity testing and a new trial. In light of this ruling, Aguirre's cross-appeal is moot.
Reversed and remanded for further proceedings consistent herewith.
NOTES
[1] The actual agreed order indicated that the item was "a copy of Roche Biomedical Laboratory's Practice and Procedure Manual, booklets, brochures, and/or other documents setting forth procedures used by Roche during the period from January, 1991 to January, 1992." We think it was reasonable for Roche, a nonparty, to understand that request to relate to the procedures it had used on the samples here and to exclude procedures irrelevant to the tests done in this case.
[2] Aguirre never served a subpoena on Roche. The production requests were submitted to Vasquez, and Roche voluntarily honored the requests.
[3] Aguirre also made various charges of wrongdoing by Roche and counsel for Vasquez. None is supported by the record. See also infra parts IV and V.
[4] Subsection 742.12(2) provides:

The test results, together with the opinions and conclusions of the test laboratory, shall be filed with the court. Any objection to the test results must be made in writing and must be filed with the court at least 10 days prior to the hearing. If no objection is filed, the test results shall be admitted into evidence without the need for predicate to be laid or third-party foundation testimony to be presented. Nothing in this paragraph prohibits a party from calling an outside expert witness to refute or support the testing procedure or results, or the mathematical theory on which they are based. Upon the entry of the order for scientific testing, the court must inform each person to be tested of the procedure and requirements for objecting to the test results and of the consequences of the failure to object.
[5] Technically, there had never been an "additional test" under section 742.12(4). The Roche request for additional blood was made because the first results were inconclusive and Roche needed to perform additional testing in order to be able to express an opinion on paternity. The trial court correctly ordered the additional testing so that Roche could complete its work. However, that additional testing was not ordered under section 742.12(4), which deals with additional testing where a party disputes the test results or expert analysis. See id.
[6] This section has since been amended to eliminate the reference to HLA testing. The statute now directs the court to require "scientific tests that are generally acceptable within the scientific community to show a probability of paternity." § 742.12(1), Fla. Stat. (1997) (as amended by ch. 97-170, § 72, at 3256, Laws of Fla.)
[7] See also supra note 6; Andre A. Moensens et al., supra, § 13.12, at 785; id. § 15.14, at 933-36.
[8] Once the laboratory has issued a final report, generally one side will wish to engage the laboratory as expert witness and the other will not. At that stage the party desiring to engage the laboratory as expert witness may, of course, proceed as with any expert.